Rel: September 20, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2024

————————————————

### SC-2023-0645

————————————————

## Universal Development Corporation

### v.

## Robbie Dellinger

## Appeal from Jefferson Circuit Court
### (CV-20-903743)

————————————————

### SC-2023-0666

————————————————

## Hatti Group RE, LLC, and Harsha Hatti

v.

**Robbie Dellinger**

**Appeal from Jefferson Circuit Court**
**(CV-20-903743)**

_____

**SC-2023-0705**
_____

**Hatti Group RE, LLC, and Harsha Hatti**

**v.**

**Robbie Dellinger**

**Appeal from Jefferson Circuit Court**
**(CV-20-141)**

MENDHEIM, Justice.

Hatti Group RE, LLC ("Hatti Group"), and Harsha Hatti, and Universal Development Corporation ("Universal") separately appeal from the judgments entered by the Jefferson Circuit Court against them and in favor of Robbie Dellinger following a jury trial of consolidated cases that involved claims asserted by Hatti, the Hatti Group, and Dellinger. We dismiss the appeals of Hatti Group and Hatti, but we

2

reverse the judgment and render a judgment in favor of Universal in its appeal.

## I. Facts

Universal is a licensed general contractor that has been in business for over 50 years. Universal originally was owned and operated by Bobby Ward. Bobby Ward died in late 2017; shortly before his death, Bobby's wife became Universal's owner and Bobby's son, Scott Ward, became the president of Universal.

Dellinger is an experienced construction worker who was directly employed by Universal from 2005 to around 2016. After that, in addition to doing work on his own, Dellinger performed work for Universal as a subcontractor or whenever Universal asked him to work on a job. In fact, even after Dellinger stopped working as a direct employee of Universal, he was entrusted with using Universal's business credit cards at Home Depot and Lowe's stores for projects that Universal asked him to do. Dellinger testified that he and Scott Ward "were as close as brothers." Ward testified that they "were friendly and we trusted each other to the best of my knowledge" and that Bobby Ward had "trusted Mr. Dellinger and Mr. Dellinger's work."

In early 2017, Dellinger became engaged in a construction-renovation project known as "The Foundry" in Alabaster ("the Foundry project"). On the Foundry project, Charles Zanaty of Zanaty Consulting, LLC, served as a consultant, Universal agreed to serve as the general contractor and to obtain the permits required for the project, and Dellinger both supervised and performed the renovation work. Dellinger described the setup of the Foundry project as follows:

> "The first project was the Foundry project in Alabaster. It was originally a grocery store. A barber company was on the property. The Foundry leased it and it had -- they wanted to turn it into a drugstore, and so I went to Scott [Ward] and Bobby [Ward] and I told them, you know, the opportunity that I had and they agreed to pull the permits and me work, you know, on site as a supervisor and that I would pay them [Universal] $5,000 for the permit and then they would -- In other words, basically I would be paid from either the owner or the lender, and in that case, it was the owner that I was paid directly from. I was paid every 30 days. Never had a minute's trouble in any kind of way. Everything went smooth."

The Foundry project was completed in mid-2017.

In 2017, Hatti Group was the owner of property consisting of four buildings located at 212 to 218 20th Street North in downtown Birmingham. The buildings were collectively known as the "Iron Age" buildings. In the fall of 2017, Harsha Hatti, Hatti Group's principal,

4

began obtaining bids for renovating the Iron Age buildings ("the Iron Age project"). According to Zanaty, the bids Hatti had received were not in his budget, and so he asked Zanaty to find other options. Zanaty submitted Hatti's initial architectural plans for the renovation to a company to get an estimate of the cost involved.[1] The initial estimate was for around $1 million. In order to offer Hatti a different option that potentially could be within his planned budget for the Iron Age project, Zanaty told Hatti about his involvement with the Foundry project and how that had worked. Hatti expressed interest in the arrangement, and Zanaty introduced Hatti to Dellinger at Zanaty's office in October or November 2017. Zanaty testified that Hatti and Dellinger "hit it off and seemed like a good fit, and so they wanted to proceed."

Hatti and Dellinger agreed to organize the Iron Age project in a manner similar to the Foundry project: Hatti would obtain the financing, Universal would serve as the general contractor and to obtain the required permits, and Dellinger would supervise the work at the job site. Both Zanaty and Dellinger testified that at no time during their meeting with Hatti did they represent that Dellinger had a general contractor's

---

[1]Randy Britton was Hatti's architect for the Iron Age project.

license or that Dellinger would serve as the general contractor for the Iron Age project. In his trial testimony, Hatti admitted that "Universal was the GC [general contractor] on the job."

According to Dellinger, after his meeting with Hatti, he told Bobby Ward and Scott Ward about the Iron Age project; Dellinger testified that Universal agreed to be the general contractor for the Iron Age project in the manner it had been for the Foundry project, i.e., it would obtain the required permits while Dellinger would supervise the work at the job site. Dellinger testified that he had paid Universal $5,000 for every permit it had obtained for the project. However, Scott Ward disagreed, stating that Universal had been paid a $5,000 flat fee for its part in the Iron Age project. Regardless, Zanaty testified that he had had a telephone conversation with Bobby Ward in which Bobby had told him to "handle" getting a contract done between Hatti and Universal in which "Universal was willing to serve as the general contractor on the project." Zanaty stated that Bobby had told him to sign the contract on behalf of Universal.

Dellinger picked up a form contract produced by the American Institute of Architects ("the AIA") that Zanaty then filled out. On January

17, 2018, Hatti and Zanaty executed an "AIA Standard Form of Agreement Between Owner and Contractor" ("the AIA contract"). The AIA contract designated "Harsha Hatti and Hatti Group RE" as the "Owner" and "Universal Development General Contractors C/O Zanaty Consulting, LLC" as the "Contractor" "for the following project: 218 20th Street No. Birmingham, AL. 35203." The AIA contract was signed by Hatti as "Owner" and by "Charles [Zanaty] as agent for" Universal. Hatti testified that, after its execution, "Universal remained at all times obligated under the AIA agreement."[2]

The key terms of the AIA contract included:

"ARTICLE 2 THE WORK OF THIS CONTRACT

"[Universal] shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

---

[2]At trial, Universal disputed that Zanaty had had permission to sign the AIA contract for Universal and that Universal was the designated general contractor because "Universal Development General Contractors" is not Universal's official business name and the address listed for Universal was the address of Zanaty Consulting, LLC. However, despite Universal's disputes about those details in the AIA contract, Scott Ward never adequately explained why he obtained permits for the Iron Age project and why he agreed "that Universal was the general contractor on this project" if there was no binding agreement between Hatti and Universal.

"ARTICLE 3 RELATIONSHIP OF THE PARTIES

"[Universal] accepts the relationship of trust and confidence established by this Agreement and covenants with [Hatti] to cooperate with the Architect and exercise [Universal's] skill and judgment in furthering the interests of [Hatti]; to furnish efficient business administration and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with [Hatti's] interests. [Hatti] agrees to furnish and approve, in a timely manner, information required by [Universal] and to make payments to [Universal] in accordance with the requirements of the Contract Documents."

Also, § 4.3 of the AIA contract stated that "[Universal] shall achieve Substantial Completion of the entire Work: … Not later than one hundred and ninety … (190) calendar days from the date of commencement of the Work."

The executed AIA contract was sent to the bank from which Hatti had obtained financing, Southern States Bank ("SSA"), which approved the initial loan amount of $988,000 for the Iron Age project.[3] SSA commercial-loan officer Mason Morris testified about the way draws on the loan worked. He stated that (1) a pay application would be filled out

---

[3]The actual amount of SSA's loan to Hatti was "roughly $2 million and some change," according to SSA commercial-loan officer Mason Morris, but Hatti was using half the money to pay off a prior loan.

by Dellinger for costs incurred during the work, (2) the pay application would then be reviewed for approval by Hatti, (3) the pay application would then be given to third-party bank inspector John Davis -- a general contractor who would go to the job site and review the work being performed -- and (4) a draw on the loan would then be approved by SSA. Morris testified that the draws were wired to a bank account owned by Dellinger, because that was the wiring information that had been provided to SSA by Hatti, and that Dellinger would use the money in that account to pay the subcontractors and vendors who were working on the Iron Age project with him. Thus, despite the language in the AIA contract, Dellinger, not Universal, received the payments for work on the Iron Age project, and he distributed payments to subcontractors and vendors. Morris testified as follows with respect to his understanding of who served in various capacities for the Iron Age project:

"Q. [Dellinger's counsel:] Who to the bank's knowledge was the general contractor on the project?

"A. Universal Development.

"Q. Okay. What was Robbie Dellinger's role in the project?

"A. As far as I was concerned, he was their foreman or however you want to --

9

"Q. Supervisor?

"A. Superintendent.

"Q. Was he the day-to-day supervisor on the job?

"A. Yes.

"Q. And he was there on behalf of Universal?

"A. Yes."

_____

"Q. [Dellinger's counsel:] To your knowledge, who was controlling the construction activities of the project?

"A. Mr. Hatti.

"Q. Is that based upon what he told you or based upon what you observed?

"A. Based upon what I observed. He was there a lot of the time.

"Q. Okay. And you saw that he had decision-making authority for everything going on construction-related.

"A. Yes. Every decision was made by him."

Other witnesses agreed with Morris's assessments regarding who was the general contractor and regarding Hatti's degree of control over the Iron Age project. With respect to who was the general contractor, Hatti testified multiple times that "Universal was the general contractor

10

on the job."[4] Scott Ward gave conflicting answers as to who he believed was the general contractor for the Iron Age project:

> "Q. [Dellinger's counsel:] You don't dispute … that Universal was the general contractor on this project, right?
>
> "A. No, sir.
>
> "Q. You said you recognized it. Mr. Hatti recognized it. Universal was the contractor.
>
> "A. Yes, sir.
>
> "Q. You all stood ready and willing if there was a problem and make sure that it was done right. Is that right?
>
> "A. To the best of my knowledge, yes."
>
> _____
>
> "Q. [Universal's counsel:] Did Universal perform any of those tasks on the Iron Age project?
>
> "A. Just pulling the permit.
>
> "Q. And the reason for that was Mr. Dellinger was doing that, correct?
>
> "A. That is correct.
>
> "Q. Under your belief that he was the general contractor on the project.

_____

[4]In another portion of his testimony, Hatti agreed with the proposition that "[i]t's undisputed that Universal was the general contractor on this project at all times." Hatti also stated that Universal "is the GC [general contractor] of record that mattered" and that "Universal was the licensed general contractor of record."

"A. That is correct.

"Q. And that the contract was between him and Mr. Hatti.

"A. That is correct."

_____

"Q. [Dellinger's counsel:] Mr. Ward, I'm a little confused because we spent yesterday afternoon and this morning where you acknowledged repeatedly that Universal was the general contractor on the project, right?

"A. As of record, yes.

"Q. All right. And so now in answer to your own lawyer's question, they weren't the contractor?

"A. We said that Dellinger was his own contractor. All Universal used our name for was to pull the permit.

"Q. You held yourself out in the public record as the general contractor on the project, right?

"A. Yes.

"Q. The City thought that you were the general contractor.

"A. Correct.

"Q. The bank thought that you were the general contractor.

"A. Correct.

"Q. Mr. Hatti thought that you were the general contractor.

"A. I'm not sure about that.

"Q. You signed every permit on this job stating that Universal was the general contractor, right?

"A. That is correct.

"Q. You attested to the accuracy of that statement by signing that permit, right?

"A. That is correct."[5]

Concerning Hatti's control over the Iron Age project, Dellinger testified that he had sent Hatti monthly invoices and that Hatti "had to approve the invoice before it ever touched anybody else's hands." Dellinger also stated that "Harsha Hatti was in control, made all of the calls … even when he asked me to hire guys to put on the [Iron Age project]," and that he did not have the authority to hire a subcontractor "without Mr. Hatti's approval." Zanaty stated that "Mr. Hatti was

---

[5]Consistent with Scott Ward's testimony, five permits were introduced at trial. All of those permits listed Universal as the "Contractor" and listed Hatti as the "Property Owner." All of those permits, except one, were signed by Ward. Dellinger testified that he had signed one of the permits with Ward's permission and that Ward had sent a picture of Universal's general contractor's license to Dellinger so that the permit could be executed.

essentially running the job" even though "Universal was the general contractor of record." Hatti himself agreed that he had "full decision-making authority on this project," including having "the final decision on sub[contractors]."

Despite the AIA contract's stated timetable for completion of the Iron Age project, multiple witnesses -- including Dellinger, Zanaty, and Hatti -- testified that it was obvious early on that the project would take longer than initially anticipated and that it would exceed its original budget. In fact, Zanaty quit the Iron Age project in June 2018 because he believed that the project would run out of money well before it was completed. Zanaty explained that the first problem had been the discovery of severe fire damage in the Iron Age buildings that required more extensive renovation than it was previously believed would be required. He also described how Hatti wanted to preserve many of the historic materials in the buildings -- such as tongue-in-groove wood ceiling boards, doors, and windows -- and to move them into storage. Those issues led to change orders that added $358,000 to the Iron Age project's cost.

The rising costs of the Iron Age project led to Dellinger's having problems getting paid for his work. Consequently, Dellinger asked Zanaty to draft an agreement between Hatti and Dellinger for the payment for the services Dellinger was performing. As Zanaty put it: "Robbie [Dellinger] came to me and said that he had had trouble getting paid and that he needed another way. I said okay. And he said that he was working for Harsha [Hatti] directly, and so we did a Personal Services Agreement." The personal-services agreement ("the PSA") was executed by Hatti and Dellinger on October 1, 2018. The PSA provided:

> "This Personal Services Agreement is made between Robbie Dellinger and Harsha Hattie[6] this First Day of October 2018.
>
> "Harsha Hattie wished to contract with Robbie Dellinger to provide supervision on the buildings owned by Harsha Hattie, known as 212 through 218 20th Street North.
>
> "Robbie Dellinger will work at the direction of Harsha Hattie. Robbie Dellinger has no liability for any decision made by Harsha Hattie on the building's redevelopment.
>
> "Robbie Dellinger, provid[es] [s]upervision only, [and] does not supply any labor or materials for Mr. Hattie.
>
> "On the first business day of each month Harsha Hattie will pay to Robbie Dellinger the sum of $7,000.00 in advance,

---

[6]Hatti confirmed in his trial testimony that his last name was misspelled in the PSA.

15

without offset or reduction in anyway. If paid after the 10th of the month, a late fee of 10% will be charged. If not paid by the 15th of the month, Robbie Dellinger will cease work immediately.

"This Agreement starts on the first day of October and is in full force and effect for the entire time that the renovation is in progress. If Harsha Hattie decides to cease work temporarily or abandon the project, Robbie Dellinger shall be paid six (6) month's compensation at $7,000 per month for the sum of $42,000.00.

"As additional incentive and consideration for Robbie Dellinger to enter into this Agreement, Harsha Hattie shall pay to Robbie Dellinger ten (10) percent of all project costs as determined by Brett Sheedy, CPA, that have occurred at the time[] the project is complete or abandoned. Completion shall be defined as the City of Birmingham granting a Certificate of Occupancy for the premises defined as 212 through 218 20th St. North, Birmingham, AL 35203.

"In case of litigation, the prevailing party shall be reimbursed for his legal expenses. Robbie Dellinger shall have the right to a jury trial and injunctive relief."

Conflicting testimony was presented at trial regarding the effect of the PSA on the relationship between the parties. Dellinger testified that the PSA was drafted for the purpose of "assuring that I got paid because I had not been paid up to that point, and [Zanaty] drafted this to protect me and he told me so." Dellinger explained that the PSA "was the document that was governing [his] relationship with Hatti … from the time it was executed … forward." However, Dellinger also testified that

16

he told Scott Ward about the PSA. Ward denied that he knew anything about the PSA before this litigation. Zanaty admitted at trial that, in his deposition testimony, he had stated that he thought the purpose of the PSA "was to get away from the general contract," "[t]o get away from the AIA contract." In contrast, Hatti testified that "[t]he AIA [contract] was always in force," despite the existence of the PSA, and that "[t]he AIA [contract] was the main document" while the PSA was "a supplemental agreement."

Even though the PSA provided that Dellinger would "not supply any labor or materials for Mr. [Hatti]," Dellinger explained that he ended up continuing to buy materials and to supply labor for the Iron Age project because Hatti "came to me and begged me literally to do this for him because he was from out of state and didn't have the contacts that I had and begged me just like he begged me to keep the job going to help him out." Hatti confirmed in his testimony that he lived in West Virginia and had relied upon Dellinger's local contacts. However, Hatti came to the job site frequently. In fact, Dellinger testified that Hatti would stay "three to four days per week or more" and that he started staying at Dellinger's house during those visits "for weeks at a time."

17

Morris testified that by late January 2019 the initial loan from SSA had been exhausted. That point marked the first time Hatti came to Dellinger and asked him to advance money to keep the Iron Age project going while Hatti obtained more financing. It is undisputed that from February through August 2019 Dellinger expended almost $225,000 of his own money to fund continuing work on the Iron Age project. Dellinger testified that he did so "using my vendor accounts, my personal credit cards, my wife's personal credit cards. … I used the money out of our retirement account." Morris testified that, during that period, Hatti had represented to SSA that "he was funding [the Iron Age project] with help from external sources."

In August 2019, Hatti secured a second loan from SSA for $882,000. However, most of the funds from that loan were used to pay amounts owed to Dellinger, subcontractors, vendors, and materialmen. To get clearance from SSA to receive payments from that second loan, on August 29, 2019, Dellinger signed a "lien waiver" which provided that "Southern States Bank is a 3rd party beneficiary hereunder and any claim of the undersigned shall be subject and inferior to any lien right of Southern

States Bank on [the Iron Age] Property."[7] Dellinger signed the lien waver as "General Contractor," with the "Company" listed as "Robbie Dellinger or Universal Development or RD Building Contractors, LLC."[8] Dellinger testified that he had "called Scott [Ward] and told him that I was going to have to sign [the lien waiver] as general contractor to get my money and he said okay." Ward stated that Dellinger had "never discussed the lien waiver" with him and that he had never seen the lien waiver "prior to this litigation." Dellinger subsequently received a check from that second loan for $276,352.68, compensating him for the amount he had personally advanced for the Iron Age project and for the $7,000 per month he was due under the PSA. After completing payments on outstanding balances, the second loan had $160,000 remaining to draw upon, which was not enough funding to complete the renovation. In October 2019, SSA froze the second loan because Hatti had stopped making payments on it.

---

[7]Dellinger and Morris testified that SSA required any vendors who had continued to work on the Iron Age project, and thus were owed money, to sign lien waivers to receive funds from the second loan.

[8]RD Building Contractors, LLC, was the name of Dellinger's company.

Because Hatti lacked financing at that point, he allegedly told Dellinger "I'm going to get refinanced and … I just need you to help me out and get this thing finished and I'll get refinanced and make sure that you're paid in full and made whole and everything." In fact, according to Dellinger, Hatti "assured me, my wife and my kids that if I would help him finish the project, that I would be made whole and that I would be well taken care of." Dellinger took Hatti at his word, and from October 2019 to May 1, 2020, Dellinger advanced approximately $500,000 of his own money to fund the continuation of the Iron Age project. In his testimony, Hatti admitted that Dellinger had "personally funded" the Iron Age project and that Dellinger had sent Hatti monthly invoices and corresponding receipts for the expenses. Hatti testified that he had told Dellinger that he was "working" on getting refinancing, not that Dellinger definitely would be repaid.

In early 2020, Dellinger told Scott Ward that he had not been paid for his work on the Iron Age project and that he was owed a significant amount of money. Dellinger testified that Ward had told him that he either needed to stop working on the project or get paid.

20

Dellinger testified that, in April 2020, he learned that a $3 million judgment had been entered against Hatti in January 2020 that stemmed from a development project Hatti had in Chicago. Dellinger stated that he had confronted Hatti about the money judgment but that Hatti had "still lied to me" by saying he was "getting refinanced." At that point, on May 1, 2020, Dellinger left the Iron Age project.

On May 5, 2020, Dellinger filed a lien on the Iron Age buildings, in his own name and in the name of Universal, in the amount of $1,084,311.31, asserting that that was the amount owed "for work, labor and materials furnished to [Hatti and the Hatti Group and] for improvements made by [Dellinger and Universal] to [the Iron Age buildings]" from September 1, 2019, to May 1, 2020. At trial, Dellinger admitted that the lien had overstated the amount owed, and he calculated the amount to be $464,000. He also explained that the reason he had filed the lien in Universal's name was "because I was not a state licensed general contractor. I was a supervisor under Universal Development." It was Dellinger's understanding that "[a] supervisor does not have lien rights. The only way that you have lien rights is if you're a state licensed general contractor." Scott Ward agreed that a supervisor

21

"would not" have lien rights, but he believed that Dellinger "was paid through his LLC [RD Building Contractors, LLC,]" and so "he should be able to file a lien with his company name."

This is the point at which an agreement between Dellinger and Universal becomes relevant. Despite their roles as adversaries at trial, both Dellinger and Scott Ward agreed in their testimony that there was an agreement between Dellinger and Universal for the Iron Age project, but they disagreed about the agreement's terms. Dellinger testified as follows about the nature of the agreement between himself and Universal:

> "Q. [Dellinger's counsel:] … So part of the agreement was I think you testified that if you needed any assistance in your work on the [Iron Age] project, they [Universal] would provide it. Is that right?
>
> "A. Yes, sir, even if I had a question.
>
> "Q. Was part of the agreement that if you had any problems getting paid or compensated for your efforts on the project that they [Universal] would assist?
>
> "A. Yes, sir.
>
> "Q. All right. Would that include filing a lien?
>
> "A. Yes, sir."

Dellinger then explained the facts surrounding his filing of the lien:

22

"A. … I went over to Universal's office and I sat down -- I went to [Scott Ward's] office. I told him, I said Scott, this is what's happened. I've had to pull off the job and I'm going to have to file a lien in Universal's name in order to collect. And Scott looked at me and he said -- I said well, Scott, I said I'm going to have to file a lien under Universal and possibly a lawsuit.

"Scott looked at me eye-to-eye and he told me, he said Robbie, do what you've got to do to get your money, if it's file a lien, if it's file a lawsuit, whatever you've got to do to get your money, file it.

"Q. [Dellinger's counsel:] Suffice it to say that he authorized you to file a lien in Universal's name.

"A. Yes, sir. And I did. And the day after -- I did that on May 5th and on May 6th, he received a stump copy via email from me of the lien."

Dellinger conceded on cross-examination, however, that he "did not document in any form any agreement with Universal Development."

In his testimony, Scott Ward admitted there was an agreement between Dellinger and Universal, but he described the terms of the agreement differently.

"Q. [Dellinger's counsel:] Now, you agree based upon this longstanding relationship between Robbie [Dellinger] and Universal that your father agreed that from time to time Universal and Robbie would enter into agreements to allow him to do extra work on commercial projects, right?

"A. We did twice.

23

"Q. Okay. And what projects were they?

"A. The Foundry project and the Iron Age project.

"....

"Q. All right. To be clear, though, when you pulled -- Was your agreement with Robbie with respect to these projects that you allowed him to serve under Universal's -- under Universal, work on their behalf, that you would receive $5,000 for every permit that you pulled?

"A. No.

"Q. Your position is that it was $5,000 per job?

"A. Five thousand dollars for the Foundry project, $5,000 for the Iron Age project.

"Q. All right. Would you agree with me that in conjunction with the Foundry job and the Iron Age job your father told you to do whatever we need to do to help Mr. Dellinger?

"A. He told me to pull the permits for Mr. Dellinger so that he could make extra money.

"Q. Did your father tell you to do whatever we need to do to help Mr. Dellinger? Isn't that what you testified to in your deposition not long ago?

"A. I didn't testify that we backed him legally. No, I did not.

"Q. I want to direct your attention, Mr. Ward, to page 33 [of Ward's deposition]. I'm sorry, 133. Are you there?

"A. Yes, sir.

"Q. All right, on Line 13, I'll ask the question. 'Was the agreement between you and Mr. Dellinger or between Mr. Dellinger and your father?' What was your answer?

"A. 'Me and Mr. Dellinger.'

"Q. Question, 'Your father was not involved in any of these agreements?'

"A. 'My father is the one that told me to be able to do whatever we needed to do to help Mr. Dellinger as in pulling permits.'

"....

"Q. On Line 3 [from Ward's deposition testimony], I'm going to read the question. 'At what point in time did your father tell you -- I want to get clarification on this. I wrote down somewhere where your dad told you -- father told you do whatever necessary to help Robbie Dellinger,' closed quote.

"Was that in connection with the Iron Age project or was that in connection with anything?

"A. With the Iron Age project.

"Q. So your dad told you to help him on the job whether it be pulling the permits or if he had any issue with the project, any work being done. Is that right?

"A. My understanding was just for pulling the permits.

"Q. The whole point of this agreement -- You said that it was a favor to Robbie. The whole point was for him to earn extra money, right?

"A. That is correct.

"Q. It makes sense that if he's having problems getting paid, you all would intervene to help in any way you could, right?

"A. That wasn't the understanding that we had with Mr. Dellinger to my knowledge, no.

"Q. All right. So when your father said do whatever you need to do, you don't think that contemplates helping him get paid for doing the work on behalf of Universal?

"A. No."

Ward further testified that he had not told Dellinger that he had permission to file a lien against the Iron Age buildings on Universal's behalf but that he also had not directly told Dellinger that he did not have permission to do so. Ward also admitted that Dellinger had sent him a copy of the lien the day after it was filed and that he had not contacted Dellinger about the lien for another four months even though Dellinger had started working on projects on properties owned by Universal in May and June 2020 after he had left the Iron Age project.

On May 15, 2020, Hatti sent Ward an email demanding that Universal "remov[e] the fraudulent $1,800,000 lien that you've put on my building" because it was "jeopardizing my project." Exactly a month later, on June 15, 2020, Hatti's attorney sent Universal's attorney a letter

threatening Universal with legal action if it did not remove the lien, contending that Dellinger and Universal had engaged in fraud and deceit by allowing Dellinger to perform work on the Iron Age project without informing Hatti that he did not have a general contractor's license and by Universal's "represent[ing] themselves as the General Contractor to Hatti as well as on permits pulled for the project from the city of Birmingham" even though Universal "did not supervise or oversee the project."

In late June or early July 2020, Universal told Dellinger to stop working on their properties and to turn in his Universal vendor credit cards. Scott Ward testified that, on the advice of counsel, he had made the decision to sever ties with Dellinger "to try and avoid getting into litigation with Mr. Hatti." On August 13, 2020, SSA foreclosed on the property that comprised the Iron Age buildings. On August 27, 2020, Universal released the lien on the Iron Age buildings. The next day, Universal's counsel sent Dellinger a letter telling him to "cease and desist from taking any actions on behalf of or representing to any individual, organization, court or other entity that you act on behalf of Universal

Development" because such actions were "unauthorized and have been taken without authority of Universal."

Subsequently, in September 2020, Dellinger filed for bankruptcy protection because all of his financial resources were exhausted. Dellinger testified that he became severely depressed and even suicidal over the course of the next couple of years because of his financial situation.

On August 24, 2020, Dellinger commenced an action on behalf of himself and Universal in the Jefferson Circuit Court against Hatti and the Hatti Group ("Dellinger v. Hatti"). Dellinger alleged that Hatti had breached an agreement with him and owed him for the funds he had personally expended on the Iron Age project. Specifically, Dellinger asserted claims of breach of contract and fraud. On August 27, 2020, Universal filed a motion to dismiss it as a plaintiff, asserting that Dellinger was not authorized to commence an action on behalf of Universal because Dellinger is not an attorney and because Universal had no claim against Hatti. The following day, August 28, 2020, the trial court dismissed Universal from the action with prejudice.

On November 3, 2020, Hatti and the Hatti Group commenced a separate action against Dellinger, RD Building Contractors, LLC, Universal, Zanaty, and Zanaty Consulting, LLC ("Hatti v. Universal"). Hatti and the Hatti Group asserted claims of breach of contract and fraud, among other claims, against the defendants. On August 13, 2021, Hatti and the Hatti Group filed a first amended complaint in which they added SSA as a defendant.

On December 20, 2021, Hatti, the Hatti Group, and SSA filed a joint motion in Hatti v. Universal requesting that the action be consolidated with Dellinger v. Hatti. On January 13, 2022, the trial court entered an order consolidating those two cases. On May 15, 2022, Dellinger asserted a breach-of-contract cross-claim against Universal in Hatti v. Universal. In the subsequent litigation leading up to the trial, all claims against SSA and Zanaty were dismissed.

A jury trial commenced during the week of June 12 through June 16, 2023. Only Dellinger, Hatti, and the Hatti Group asserted claims at trial. Dellinger asserted claims of breach of contract and fraud against Hatti: Dellinger's breach-of-contract claim was based on the PSA, and his fraud claim, which was also asserted against the Hatti Group, was based

on his contention that Hatti had told Dellinger that he was seeking refinancing even though Hatti had allegedly known he could not obtain refinancing because of the $3 million judgment against him.[9] Dellinger asserted a claim of breach of an oral contract against Universal based on Universal's removal of the lien that Dellinger had placed on the Iron Age buildings. Hatti and the Hatti Group asserted breach-of-contract claims against Universal and Zanaty Consulting, LLC, respectively.[10]

At the close of Dellinger's case and after the presentation of all the evidence, both Hatti and Universal argued that they were entitled to a judgment as a matter of law because, they argued, Dellinger's claims were predicated on work Dellinger had performed without a general contractor's license, which Ala. Code 1975, § 34-8-1 et seq., prohibits. The trial court denied both defendants' motions for a judgment as a matter of law on that basis because, the trial court believed, whether Dellinger was a general contractor was "a factual question" that should be determined

_____

[9]Dellinger did not present a breach-of-contract claim against the Hatti Group because the PSA was between Hatti personally and Dellinger.

[10]Hatti's claims against Dellinger and RD Building Contractors, LLC, had been disposed of by summary judgment before trial.

by the jury. Universal also sought a judgment as a matter of law on the basis that Dellinger's breach-of-contract claim against it was barred by the Statute of Frauds, specifically § 7-2-201(1), Ala. Code 1975, of the Alabama Uniform Commercial Code. The trial court denied that portion of Universal's motion because "there are numerous genuine issues of material fact for the jury to decide including whether there was an oral agreement, whether there was a breach of the oral agreement and, if there was a breach of the oral agreement, whether any damages are due."

Before the trial court instructed the jury, counsel for the parties discussed whether the jury should be charged on the issue of prejudgment interest regarding the breach-of-contract claims. With respect to that issue, the following colloquy occurred:

> "[Hatti's counsel]: … Your Honor, I thought that your practice generally is to take all of the interest charges out.
>
> "THE COURT: Just do the math?
>
> "[Hatti's counsel]: Yes, sir. Because if you get one back and the numbers don't work out, we don't know that the jury made a mistake in trying to do the math or what, so I think that the better practice is do that and then we get a calculator out and do it and agree on what that number ought to look like.
>
> "[Dellinger's counsel]: I can't argue to the Jury -- Can I say the interest would be or not?

31

"[Hatti's counsel]: I think that everybody agrees that on breach of contract, whatever the date of the breach is, it's six percent simple. It's not six percent compound.

"THE COURT: I'm happy to do that if y'all are in agreement for me to do it or we can tell them to do it.

"[Hatti's counsel]: I think that it shortens it up.

"[Universal's counsel]: I prefer to take that out, Judge.

"[Hatti's counsel]: It shortens it up.

"THE COURT: <u>So all parties are in agreement that any breach of contract damages that may be awarded by the jury, we will add six percent interest to the actual verdict</u>.

"[Hatti's counsel]: Yes.

"THE COURT: Are there any claims that have -- I think that we have on the verdict form discrete requests for verdict on breach of contract and fraud, so we won't have -- if there happens to be a fraud verdict, there wouldn't be -- I think that's right. <u>Okay. I'll take that out, all the interest on the damages -- interest on damages for breach charge</u>."

(Emphasis added.) In short, the parties agreed that the jury would not be charged with respect to assessing prejudgment interest on any damages awarded for breach of contract but that, rather, 6% interest would be added to any damages awarded for breach of contract.

On June 16, 2023, the jury reached its verdicts. The jury found in favor of Dellinger and against Universal on Dellinger's claim of breach of

an oral contract; the jury awarded Dellinger $154,667 in compensatory damages as to that claim. The jury found in favor of Dellinger and against Hatti on Dellinger's claim of breach of contract; the jury awarded Dellinger $309,333 in compensatory damages as to that claim. The jury found in favor of Dellinger and against Hatti on Dellinger's claim of fraud; the jury awarded Dellinger $400,000 in compensatory damages and $800,000 in punitive damages as to that claim. The jury found in favor of the Hatti Group on Dellinger's fraud claim against the Hatti Group. The jury found in favor of Universal and Zanaty Consulting, LLC, and against Hatti and the Hatti Group, on Hatti and the Hatti Group's breach-of-contract claims against Universal and Zanaty Consulting, LLC.

On June 20, 2023, the trial court entered "Final Judgments" on the jury's verdicts in both Hatti v. Universal and Dellinger v. Hatti. However, the trial court neglected to include prejudgment interest on the breach-of-contract damages awards in favor of Dellinger and against Universal and Hatti. Accordingly, on June 30, 2023, Dellinger filed a "Motion to Alter or Amend the Final Judgment to Include Prejudgment Interest"

33

pursuant to Rule 60(a), Ala. R. Civ. P. In pertinent part, that motion

provided:

"4. Because the award of prejudgment interest was expressly contemplated by the Court and the parties, Dellinger is entitled to an award of prejudgment interest at 6% per annum on his breach of contact claims as a matter of law.

"5. On June 20, 2023, the Court entered a Final Judgment which set out the jury's verdict and damages assessed on each claim; however, the Order was silent on the issue of prejudgment interest.

"6. Dellinger submits that the omission of prejudgment interest on such claims was an oversight.

"7. Rule 60(a), Ala. R. Civ. P., states that the Court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order or other part of the record. The addition of interest is a ministerial task within the purview of Rule 60(a).

"8. That prejudgment interest of six (6) percent is ascertainable and can readily be calculated from the date of Universal's breach of the parties' contract (i.e., August 27, 2020), and Hatti's breach of the personal services agreement (i.e., May 1, 2020).

"9. That based on the jury's breach of contract award of $154,667 against Universal, and an interest rate of 6%, the prejudgment interest totals $26,009. That based on the jury's breach of contract award of $309,333 against Hatti, and an interest rate of 6%, the prejudgment interest totals $57,968.

34

"10. That counsel for Hatti and Universal acknowledge Dellinger's right to prejudgment interest and have no objection to its imposition herein.

"11. That Dellinger respectfully requests that the Court amend the Final Judgment to include prejudgment interest at the statutory rate and dates set forth above."

On June 30, 2023, the trial court entered an order that provided:

"Having received and reviewed Dellinger's Motion to Alter or Amend the Final Judgment to Include Prejudgment Interest …, the Court confirms that prejudgment interest shall be added to the contract claim judgments …. Wherefore, the Court **DIRECTS** counsel for Dellinger to meet and confer with counsel for Universal Development Corporation and counsel for Harsha Hatti to confirm that those parties have no objection to Dellinger's mathematical calculation of prejudgment interest on these contract claims. If there is an objection to the mathematical calculations, the Court will set a hearing on the same. If there is no objection to the mathematical calculations, counsel for Dellinger shall file proposed orders … containing the correct amended final judgment amounts for each case. By confirming Dellinger's mathematical calculations, counsel for Universal Development Corporation and counsel for Harsha Hatti are in no way waiving any post-judgment legal arguments they have in either case (other than an argument that Dellinger's mathematical calculation for prejudgment interest amounts on the contract claim judgments is incorrect)."

(Bold typeface and capitalization in original.)

On July 18, 2023, Universal filed a "Renewed Motion for Judgment as a Matter of Law and/or Motion to Alter, Amend or Vacate Jury

35

Verdict" in <u>Hatti v. Universal</u>. On July 31, 2023, Dellinger filed a response in opposition to that postjudgment motion.

On August 2, 2023, Dellinger filed a "Motion for Ruling on Prejudgment Interest" in which he informed the trial court:

> "1. Pursuant to the Court's instructions, Dellinger's counsel has consulted with counsel for Universal Development Corporation and Harsha Hatti regarding the imposition and calculation of prejudgment interest to be added on the contract judgments entered against their clients.
>
> "2. The undersigned has been advised that neither Universal Development Corporation nor Harsha Hatti have objected to the prejudgment interest calculation or amount as provided by Dellinger.
>
> "....
>
> "Wherefore, ... Robbie Dellinger respectfully requests that the Court enter an order amending the final judgment[s] ... to add prejudgment interest consistent with the proposed orders filed by Dellinger in the respective actions."

On August 3, 2023, the trial court entered what it styled as an "Amended Final Order" in <u>Hatti v. Universal</u> that stated:

> "This Court entered a Final Judgment in this matter on June 20, 2023. Thereafter, Robbie Dellinger filed a Motion to Alter or Amend the Final Judgment to Include Prejudgment Interest. The Court confirmed that prejudgment interest shall be added to the contract judgments in this case. Further the Court has now been advised that the parties have conferred and agreed that Dellinger is due to be awarded prejudgment

36

interest on his contract claim entered against Universal Development Corporation in the amount of $26,009.00.

> "It is hereby ORDERED that prejudgment interest in the amount of $26,009.00, is added to the Final Judgment entered in favor of Robbie Dellinger on his claims against Universal Development Corporation in this matter for a total Final Judgment of One Hundred, Eighty Thousand, Six Hundred Seventy-Six and 00/100 Dollars ($180,676.00) against Universal Development Corporation."

(Capitalization in original; emphasis omitted.)

On August 4, 2023, the trial court entered an order denying Universal's postjudgment motion. On September 7, 2023, Universal filed a notice of appeal in Hatti v. Universal, contesting the judgment against it stemming from Dellinger's breach-of-an-oral-contract cross-claim.

On August 15, 2023, the trial court entered what it styled as an "Amended Final Order" in Dellinger v. Hatti:

> "This Court entered a Final Judgment in this matter on June 20, 2023. Thereafter, Robbie Dellinger filed a Motion to Alter or Amend the Final Judgment to Include Prejudgment Interest. The Court confirmed that prejudgment interest shall be added to the contract judgments in this case. Further the Court has now been advised that the parties have conferred and agreed that Dellinger is due to be awarded prejudgment interest on his contract claim entered against Harsha Hatti in the amount of $57,968.00.

> "It is hereby ORDERED that prejudgment interest in the amount of $57,968.00, is added to the Final Judgment entered in favor of Robbie Dellinger on his claims against

Harsha Hatti in this matter for a total Final Judgment of One Million, Five Hundred Sixty-Seven Thousand, Three Hundred One and 00/100 Dollars ($1,567,301.00) against Mr. Hatti."

(Capitalization in original; emphasis omitted.)

On September 14, 2023, Hatti and the Hatti Group filed a "Post-Judgment Renewed Motion for Judgment as a Matter of Law, Alternatively, Motion for New Trial Pursuant to Ala. R. Civ. P. 59" in Dellinger v. Hatti. On September 15, 2023, Hatti and the Hatti Group filed a notice of appeal in Hatti v. Universal that listed August 3, 2023, as the date of the judgment. On September 26, 2023, Dellinger filed a response in opposition to the postjudgment motion filed by Hatti and the Hatti Group in Dellinger v. Hatti. Also on September 26, 2023, Hatti and the Hatti Group filed a notice of appeal in Dellinger v. Hatti that listed August 15, 2023, as the date of the judgment and that contested the judgments against Hatti stemming from Dellinger's claims of breach of contract and fraud. On September 28, 2023, the trial court entered an order denying Hatti and the Hatti Group's postjudgment motion filed in Dellinger v. Hatti.

## II. Standard of Review

"When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same

38

standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So. 2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So. 2d 1350 (Ala. 1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So. 2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So. 2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So. 2d 1126 (Ala. 1992)."

Waddell & Reed, Inc. v. United Invs. Life Ins. Co., 875 So. 2d 1143, 1152 (Ala. 2003).

## III. Analysis

### A. Dellinger's Motion to Dismiss the Hatti Appeals

We begin by addressing Dellinger's motion to dismiss the appeals filed by Hatti and the Hatti Group. First, Dellinger contends that Hatti and the Hatti Group's appeal in Hatti v. Universal is due to be dismissed because "no adverse judgment in favor of Dellinger was entered against Hatti in that action and therefore, no right of appeal to challenge

Dellinger's jury verdict exists therein." Dellinger's motion to dismiss the Hatti appeals, p. 3 (emphasis in original). Dellinger refers to Hatti and the Hatti Group's appeal number SC-2023-0666 that was filed on September 15, 2023. It is axiomatic that "'[g]enerally an appeal can be brought only by a party or his personal representative ... from an adverse ruling ... contained in a final judgment.'" Caton v. City of Pelham, 329 So. 3d 5, 19 (Ala. 2020) (quoting Home Indem. Co. v. Anders, 459 So. 2d 836, 842 (Ala. 1984)). Hatti and the Hatti Group sustained adverse judgments in Hatti v. Universal with respect to their breach-of-contract claims against Universal and Zanaty Consulting, LLC, but they did not appeal those judgments. Instead, they appear to have attempted to appeal the adverse judgment rendered in favor of Dellinger and against Hatti that was entered in Dellinger v. Hatti. In his appellate brief, Hatti states that he "filed a notice of appeal in that matter (appeal number [SC-2023-0666]) -- despite no specific order being entered against him -- in an abundance of caution to ensure his appellate rights were preserved." Hatti's brief, p. 11 n.8 (emphasis added). In his response to Dellinger's motion to dismiss, Hatti further defends his appeal filed in Hatti v.

Universal by quoting from opinions of the Court of Civil Appeals that have observed:

> "'An appellant's designation of a judgment or order on his notice of appeal does not limit the scope of appellate review, see Rule [3(c)], Ala. R. App. P., and this court may treat a notice of appeal that is filed in one consolidated case as being effective as to the other consolidated case when the intention to appeal the judgments in both cases is clear, see R.J.G. v. S.S.W., 42 So. 3d 747, 751 n.2 (Ala. Civ. App. 2009).'"

Lindsey v. Pollard, 376 So. 3d 496, 502-03 (Ala. Civ. App. 2022) (quoting Hossley v. Hossley, 264 So. 3d 893, 897 (Ala. Civ. App. 2018)) (footnote omitted).

But Lindsey does not help Hatti because the appellant in that case had appealed from a specific judgment that was adverse to the appellant.[11] In Lindsey, the judgments entered in all three of the consolidated cases were adverse to the appellant, but the appellant chose to appeal only one of the judgments. The question was whether the appellant's failure to appeal the judgments in the other two cases foreclosed the appellant's appeal. The Court of Civil Appeals concluded that the appeal was valid because,

---

[11]Hossley is inapposite because the Court of Civil Appeals determined that the trial court's judgments in both of the consolidated cases were not final judgments and, therefore, were not appealable.

41

"[e]ven though the judgments in each of the consolidated cases are identical, <u>each consolidated case was separate; the claims adjudicated in each of the consolidated cases were distinct;</u> and, if the judgment resolving the claims in the boundary-line-dispute action is reversed, the reversal will not result in inconsistent judgments with regard to the claims adjudicated in either of the protection-from-abuse cases."

376 So. 3d at 503 (emphasis added). This Court has expanded on the observation made in <u>Lindsey</u> as follows:

"[W]hen two or more actions are consolidated under Rule 42, Ala. R. Civ. P., the actions do not lose their separate identities. <u>League v. McDonald</u>, 355 So. 2d 695, 697 (Ala. 1978). Moreover, '[a]n order of consolidation does not merge the actions into a single [action], change the rights or the parties, or make those who are parties to one [action] parties to another.' Jerome A. Hoffman, <u>Alabama Civil Procedure</u> § 5.71 (2d ed. 2001) (citing <u>Evers v. Link Enters., Inc.</u>, 386 So. 2d 1177 (Ala. Civ. App. 1980)). Finally, '"<u>in consolidated actions ... the parties and pleadings in one action do not become parties and pleadings in the other</u>."' <u>Ex parte Flexible Prods. Co.</u>, 915 So. 2d 34, 50 (Ala. 2005) (quoting <u>Teague v. Motes</u>, 57 Ala. App. 609, 613, 330 So. 2d 434, 438 (Civ. 1976))."

<u>Solomon v. Liberty Nat'l Life Ins. Co.</u>, 953 So. 2d 1211, 1222 (Ala. 2006) (emphasis added).

The same principles apply here. Separate judgments were entered in <u>Hatti v. Universal</u> and <u>Dellinger v. Hatti</u>, even though the cases were consolidated for purposes of discovery and trial, and there was no judgment rendered in favor of Dellinger that was adverse to Hatti in

Hatti v. Universal. Hatti did not gain the right to appeal in Hatti v. Universal simply because that case was consolidated with Dellinger v. Hatti. The cases remained separate and distinct despite their consolidation, as did the rights to appeal in each case. Consequently, Hatti's appeal number SC-2023-0666 must be dismissed because no judgment in favor of Dellinger and adverse to Hatti was entered in Hatti v. Universal. Concomitantly, we note that we see no reason why the Hatti Group is a party to any of these appeals because none of the judgments at issue on appeal are based on adverse verdicts against the Hatti Group; therefore, the Hatti Group is dismissed as a party to these appeals.

Dellinger also contends that Hatti's appeal in Dellinger v. Hatti, appeal number SC-2023-0705, is due to be dismissed because Hatti's appeal was untimely. Dellinger observes that the original judgment in Dellinger v. Hatti was entered by the trial court on June 20, 2023, that Hatti's renewed motion for a judgment as a matter of law and motion for a new trial under Rules 50(b) and 59, Ala. R. Civ. P., was filed on September 14, 2023, more than 30 days after the entry of the June 20, 2023, judgment, and that Hatti's appeal in that case was filed on September 26, 2023, more than 42 days after the entry of the June 20,

2023, judgment. Dellinger further argues that the trial court's "Amended Final Order" in <u>Dellinger v. Hatti</u> that was entered on August 15, 2023, to include prejudgment interest on Dellinger's breach-of-contract claim against Hatti did not constitute a new final judgment because the omission of prejudgment interest in the June 20, 2023, judgment was a "clerical mistake" that was corrected pursuant to Rule 60(a), Ala. R. Civ. P. Dellinger observes that

> "[a] change to a judgment to correct a clerical error relates back to the date of the entry of the final judgment. See <u>[Luker v. Carrell</u>, 25 So. 3d 1148, 1152 (Ala. Civ. App. 2006), rev'd on other grounds, 25 So. 3d 1152 (Ala. 2007)]. Unlike when a judgment 'correction' actually amounts to an amendment of a judgment that changes a prevailing party, a correction to a final judgment pursuant to Rule 60(a) 'has no bearing on the timeliness of an appeal from the original uncorrected judgment.' <u>See</u> <u>J.S. v. S.W.</u>, 702 So. 2d 169, 171 (Ala. Civ. App. 1997)."

<u>Barnes v. HMB, LLC</u>, 24 So. 3d 460, 462 (Ala. Civ. App. 2009) (footnote omitted). In short, Dellinger contends that the time for appeal in <u>Dellinger v. Hatti</u> is measured from June 20, 2023, not August 15, 2023, and that, therefore, Hatti's appeal number SC-2023-0705 is untimely.

Unsurprisingly, Hatti disagrees, countering that he believes the June 20, 2023, judgment was not a final judgment because it did not

ascertain the total amount of damages. For support, Hatti cites and quotes general statements about what constitutes a final judgment.

> "'A final judgment is a terminative decision by a court of competent jurisdiction which demonstrates there has been complete adjudication of all matters in controversy between the litigants within the cognizance of that court. That is, it must be conclusive and certain in itself. (citations omitted) All matters should be decided; <u>damages should be assessed with specificity leaving the parties with nothing to determine on their own</u>. A judgment for <u>damages</u> to be final must, therefore, be for a sum certain determinable without resort to extraneous facts. (citations omitted)'"

<u>Moody v. State ex rel. Payne</u>, 351 So. 2d 547, 551 (Ala. 1977) (quoting <u>Jewell v. Jackson & Whitsitt Cotton Co.</u>, 331 So. 2d 623, 625 (Ala. 1976)) (first emphasis added). Hatti argues that, because the trial court ordered the parties to meet and agree on the amount of prejudgment interest, something was left to be determined with respect to damages, and that therefore the June 20, 2023, judgment was not a final judgment.

Neither <u>Moody</u> nor <u>Jewell</u> involved assessments of prejudgment interest on a damages verdict. In <u>Moody</u>, the judgment at issue established liability but "defer[ed] determination of the amount [of damages] for later hearing." 351 So. 2d at 551. In <u>Jewell</u>, this Court explained that

45

"[a]fter remand no evidence was taken of market prices showing damages sustained that would enable the trial court to fix them in an amount certain. The trial court's amended decree arbitrarily set dates as being those from which damages should be measured. No evidence was adduced concerning the dates of events involved in this controversy that would facilitate the trial court's determination of pertinent market prices to be employed in computing damages as of those relevant dates -- dates of injury under the law. The trial court merely recorded what the parties wished to be allowed to prove, as expounded by their attorneys. The court subsequently 'awarded damages,' but did so without any evidence as to what those damages were and by what measure they were to be assessed."

Jewell, 331 So. 2d at 625. Unlike in Moody or Jewell, in these cases the amount of damages awarded was certain; the addition of prejudgment interest simply had not been performed by the trial court.

However, Hatti also points to Ex parte Bessemer Board of Education, 68 So. 3d 782 (Ala. 2011), which did involve an order that did not specify the amount of prejudgment interest. In a footnote, the Court observed:

"In the present case, the trial court's April 23, 2005, order does not specifically establish the amount due under the statute, and it explicitly states that 'if the parties are unable to agree on the calculation of the exact amount, and the amount of interest, the Court will resolve that dispute on appropriate motion'; thus, it leaves the parties with something to determine on their own and leaves open the possibility of further action by the trial court. Furthermore, the order awarded prejudgment interest but did not set the

> amount of interest or the specific date from which the interest was awarded. See <u>Cinerama, Inc. v. Sweet Music, S.A.</u>, 482 F.2d 66, 69 (2d Cir.1973) (holding that a judgment that determined part of the damages (the principal amount) but did not determine the amount of prejudgment interest was not a final judgment) (cited with approval in <u>Precision American Corp. v. Leasing Serv. Corp.</u>, 505 So. 2d 380, 381-82 (Ala. 1987)). Therefore, the trial court's April 23, 2005, order did not constitute a final judgment."

68 So. 3d at 788 n.5 (emphasis added).

But the situation in these cases differs markedly from the one presented in <u>Bessemer Board of Education</u>. In these cases, as we recounted in the rendition of the facts, the parties expressly decided in the jury-charge conference that the jury would not be instructed about prejudgment interest because the parties believed that doing so would be potentially confusing. The parties further agreed that a simple calculation would be performed after the jury verdicts were returned if breach-of-contract damages were awarded: 6% interest would be added to the verdict amount. In other words, the parties agreed that, if breach-of-contract damages were awarded, the prevailing party was entitled to prejudgment interest of 6% under the law.[12]

_____

[12]The parties apparently had in mind § 8-8-8, Ala. Code 1975, which provides:

47

"A Rule 60(a) motion may not be used <u>to alter the rate of prejudgment interest</u> because that would call into question the substantive correctness of the judgment rather than remedy a clerical error or omission." <u>McNickle v. Bankers Life & Cas. Co.</u>, 888 F.2d 678, 682 (10th Cir. 1989) (emphasis added). Here, the rate of prejudgment interest was settled, and so Hatti asserts that the amount of prejudgment interest was not certain because the date of the alleged breach of contract was unknown: "The verdict forms did not ask the jury to determine the date of the alleged breach … and that disputed fact was not specifically determined by the jury in its award of damages." Hatti's opposition to Dellinger's motion to dismiss the Hatti appeals, p. 3. In a footnote in his opposition to the motion to dismiss, Hatti now claims that the date of the breach could have been in October 2019, when Hatti allegedly stopped paying Dellinger for his work, or it could have been May 1, 2020, the date

---

"All contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty bear interest from the day such money, or thing, estimating it at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed."

Dellinger walked off the job, as Dellinger stated in his "Motion to Amend to Add Interest." See id. at p. 10 n.3.

However, that is an entirely new argument that Hatti never presented to the trial court. See, e.g., Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala. 1992) ("This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.") Moreover, the argument is incorrect because the date of the breach was never an issue with respect to awarding prejudgment interest, which is why the issue was not submitted to the jury. The parties had simply agreed before the jury began deliberating that 6% interest would be added to any jury award for breach of contract. Thus, in these cases, the parties had agreed before the jury began deliberating that the prevailing party on the breach-of-contract claims was entitled to a specific amount of prejudgment interest because it was mandated by law, but the trial court, by its own admission in its June 30, 2023, order, had simply failed to add prejudgment interest to the jury's damages award. That is precisely the situation under which Rule 60(a) allows a correction of the judgment amount.

"A court does have authority under Rule 60(a), Ala. R. Civ. P., to correct an omission of prejudgment interest from a judgment <u>where it had intended to award prejudgment interest but failed to do so when it entered its judgment, or where the judgment failed to include prejudgment interest that is mandated by law</u>. See <u>Paddington Partners v. Bouchard</u>, 34 F.3d 1132, 1141, 1144 (2d Cir. 1994); <u>Klingman v. Levinson</u>, 877 F.2d 1357, 1361 (7th Cir. 1989); <u>McNickle v. Bankers Life & Cas. Co.</u>, 888 F.2d 678, 682 (10th Cir. 1989); <u>Frigitemp Corp. v. Lefrak</u>, 781 F.2d 324, 327 (2d Cir. 1986); <u>Frederick v. Mobil Oil Corp.</u>, 765 F.2d 442, 450 (5th Cir. 1985); <u>Lee v. Joseph E. Seagram & Sons, Inc.</u>, 592 F.2d 39, 40, 42-44 & n. 4 (2d Cir. 1979); <u>Morgan Guar. Trust Co. v. Third Nat'l Bank</u>, 545 F.2d 758, 759 (1st Cir. 1976); <u>Warner v. City of Bay St. Louis</u>, 526 F.2d 1211, 1212-13 & n.4 (5th Cir. 1976); see also 11 Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 2817 (2d ed. 1995) ('It has been held that a motion for amendment of the judgment to include prejudgment interest is under Rule 60(a), and is not subject to the time limit of Rule 59(e), if the party is entitled to interest as a matter of right, but that if allowance of prejudgment interest is in the discretion of the court then the [time] limit of Rule 59(e) applies.'); <u>id</u>. § 2854, at 245-46 ('The judgment may be corrected by including interest if this is a matter of right but not if allowing interest is discretionary.'); 12 James Wm. Moore et al., <u>Moore's Federal Practice</u> § 60.11[2][b] (3d ed. 1997). But see <u>Osterneck v. Ernst & Whinney</u>, 489 U.S. 169, 176 n. 3 & 177, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989) (holding 'that a postjudgment motion for discretionary prejudgment interest is a Rule 59(e) motion' and noting in dictum that 'the result should [not] be different where prejudgment interest is available as a matter of right'); accord <u>Capstick v. Allstate Ins. Co.</u>, 998 F.2d 810, 812-13 (10th Cir. 1993); <u>Keith v. Truck Stops Corp. of America</u>, 909 F.2d 743, 746 (3d Cir. 1990)."

<u>State Pers. Bd. v. Akers</u>, 797 So. 2d 422, 426 n.4 (Ala. 2000) (emphasis

added). See generally <u>Continental Oil Co. v. Williams</u>, 370 So. 2d 953,

954 (Ala. 1979) ("The term 'clerical errors' is not limited solely to errors by the clerk in transcription. It can also include errors by others, such as a jury foreman, counsel, a party, or the judge himself.").

The August 15, 2023, amended judgment merely stated what was supposed to have been included in the June 20, 2023, judgment. The trial court's June 30, 2023, order requiring the parties to confirm that there was no objection to the mathematical calculations was a pro forma request, and the parties unsurprisingly had no objections because the calculations were in line with the parties' agreement during the jury-charge conference. "The effect of a Rule 60(a) amendment is a correction of the original judgment to reflect the original intention of the trial court. There was no change in the actual judgment. The amendment relates back to the original judgment and becomes a part of it." Bergen-Patterson, Inc. v. Naylor, 701 So. 2d 826, 829 (Ala. Civ. App. 1997). Therefore, the date of the final judgment was June 20, 2023. Hatti's postjudgment motion was filed more than 30 days after that date, and so it did not enlarge the time for filing an appeal. Hatti's appeal was filed

well after the 42-day deadline for a timely appeal.[13] Accordingly, Hatti's appeal in Dellinger v. Hatti, appeal number SC-2023-0705, is due to be dismissed.

B. Universal's Challenge to Dellinger's Breach-of-Contract Claim

The remaining appeal to be resolved is appeal number SC-2023-0645: Universal's challenge to Dellinger's breach-of-contract cross-claim against it in Hatti v. Universal. Universal does not challenge the amount of the damages award, nor does it argue that the jury's verdict was against the great weight of the evidence. Instead, Universal argues that the trial court should have granted its motions for a judgment as a matter of law on two grounds. First, Universal argues that Dellinger's claim

---

[13]We note that even if we could accept Hatti's appeal in Hatti v. Universal, appeal number SC-2023-0666, as an appeal in Dellinger v. Hatti, the September 15, 2023, notice of appeal in that case still would not have been timely because it was filed more than 42 days after the entry of the June 20, 2023, judgment. The only way that Hatti's appeal in Hatti v. Universal could have been considered timely is if Hatti somehow traveled under Universal's postjudgment motion, which was denied on August 4, 2023. But as we already have noted, "'"in consolidated actions ... the parties and pleadings in one action do not become parties and pleadings in the other."'" Solomon v. Liberty Nat'l Life Ins. Co., 953 So. 2d 1211, 1222 (Ala. 2006) (quoting Ex parte Flexible Prods. Co., 915 So. 2d 34, 50 (Ala. 2005), quoting in turn Teague v. Motes, 57 Ala. App. 609, 613, 330 So. 2d 434, 438 (Civ. 1976)).

against it alleging breach of an oral contract was void because the claim was based on Dellinger's work as an unlicensed general contractor. Second, Universal contends that Dellinger's claim alleging breach of an oral contract is void under the Statute of Frauds. We will discuss those arguments in reverse order.

Universal contends that Dellinger's breach-of-an-oral-contract claim should not have been submitted to the jury because the contract violated the Statute of Frauds. Specifically, on appeal, Universal cites § 8-9-2, Ala. Code 1975, which provides, in pertinent part:

> "In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
>
> "(1) Every agreement which, by its terms, is not to be performed within one year from the making thereof."

Universal argues that the foregoing statutory provision applies because "[t]he alleged breach (Universal's removal of Dellinger's fraudulent lien) for which Dellinger was awarded damages occurred more than seventeen (17) months after Universal performed its only agreed-upon role which was to pull the permit." Universal's brief, p. 44.

53

As Dellinger notes, the first problem with Universal's argument is that, in the trial court, Universal did not argue that the oral agreement between Dellinger and Universal was void under the Statute of Frauds based on § 8-9-2(1); rather, Universal argued that the Statute of Frauds under the Alabama Uniform Commercial Code, specifically § 7-2-201(1), Ala. Code 1975, applied in this case to render the contract between Dellinger and Universal void. Section 7-2-201(1) provides, in pertinent part, that "a contract for the sale of goods for the price of five hundred dollars ($500) or more" must be in writing. In the trial court, Dellinger responded to Universal's invocation of § 7-2-201(1) by observing that the oral contract between Dellinger and Universal did not concern a sale of goods: "Rather, the parties' agreement required Universal to serve as the general contractor of record on a construction project, pull necessary permits and support Dellinger's work and efforts to compensated, and did not contemplate or involve a 'transaction of goods.'" Dellinger went on to note that, "[t]ellingly, Universal fails to cite § 8-9-2 based on its recognition that such statutory provisions are inapplicable to Dellinger's contract claim." On appeal, Universal now cites § 8-9-2, but, as we have already observed with respect to one of Hatti's arguments, we are not at

54

liberty to consider Universal's new argument. See, e.g., <u>Rodriguez-Ramos</u> <u>v. J. Thomas Williams, Jr., M.D., P.C.</u>, 580 So. 2d 1326, 1328 (Ala. 1991) (noting that an appellate court "cannot put a trial court in error for failing to consider a matter which, according to the record, was not presented to, nor decided by[,] it").

However, even if we were to consider Universal's argument, § 8-9-2(1) does not void the oral contract between Dellinger and Universal. That section requires a written contract for an agreement "which, <u>by its</u> <u>terms</u>, is not to be performed within one year from the making thereof." (Emphasis added.) Although, as the rendition of the facts makes clear, Dellinger and Universal disagreed as to the exact terms of their oral agreement, neither party presented evidence indicating that the agreement's terms provided that it would not or could not be performed within one year. Thus, § 8-9-2(1) is inapplicable in this case.

Universal also contends that Dellinger's breach-of-contract claim is void because his claim "undisputedly arose from his performance of construction activities covered by Alabama's statutes governing the activities of licensed general contractors, set forth at Ala. Code §§ 34-8-1, et seq." Universal's brief, p. 33.

> "For the purpose of this chapter [i.e., Title 34, Chapter 8], a 'general contractor' is defined to be one who, for a fixed price, commission, fee, or wage undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more, shall be deemed and held to have engaged in the business of general contracting in the State of Alabama."

§ 34-8-1(a), Ala. Code 1975. "Although the statutes themselves provide a misdemeanor penalty for noncompliance, this Court has gone further, holding express or implied contracts with nonlicensed 'general contractors' to be null and void as a violation of public policy." Hawkins v. League, 398 So. 2d 232, 235 (Ala. 1981).

> "A party seeking to nullify a contract based on the nonlicensure of an alleged general contractor must prove: '(1) that the alleged contractor was unlicensed; (2) that the contracted work was of the type covered by the licensure statute; and (3) that the "cost" of the work was $[5]0,000 or more.' Central Alabama Home Health Servs., Inc. v. Eubank, 790 So. 2d 258, 260 (Ala. Civ. App. 2000) (citing Tucker v. Walker, 293 Ala. 589, 592, 308 So. 2d 245, 247 (1975))."

MSE Bldg. Co. v. Stewart/Perry Co., [Ms. SC-2022-0910, Oct. 20, 2023] __ So. 3d __, __ (Ala. 2023) (plurality opinion).

It is undisputed that Dellinger is not a licensed general contractor. It is also undisputed that the Iron Age project had a cost in excess of

$50,000. Universal contends that Dellinger's work was the type covered by the licensure statutes:

> "Per their PSA, Dellinger was hired by Hatti to provide 'supervision' of a construction project for which the original contract price was $998,000.00, well over $50,000. Dellinger also continued to provide labor and materials for the project after signing the PSA, in addition to supervising, because Hatti did not have local contacts. Dellinger also funded the renovation project for months using his own money during a time when Hatti was unable to do so himself. Based on the plain language of the statute, Dellinger was unequivocally acting as a 'general contractor' or 'subcontractor' under Alabama's [general-contractor] [s]tatutes because he was 'supervising' or otherwise 'engaging in' the 'construction, alteration[,] … rehabilitation, remediation, reclamation, or demolition of any building … where the cost of the undertaking is [over] fifty thousand dollars….' Ala. Code § 34-8-1(a)."

Universal's brief, pp. 36-37 (citations to the record omitted).

Dellinger offers several counterarguments. First, he observes that Universal was the designated general contractor on the Iron Age project in the AIA contract. Indeed, as the rendition of the facts elucidates, Dellinger, Hatti, Scott Ward, Zanaty, and Morris all testified that Universal was the general contractor for the Iron Age project. Indeed, Ward testified that Universal "stood ready and willing if there was a problem and make sure that [the Iron Age project] was done right." The permits for the Iron Age project submitted into evidence also indicated

57

that Universal acted as the general contractor under the law for the purpose of obtaining the necessary permits to complete the project.

On the other hand, Dellinger signed a lien waiver on August 29, 2019, in which he stated that he was the "general contractor" on the Iron Age project. In an email that Zanaty sent to Dellinger on October 1, 2018, for the purpose of obtaining bank approval to receive payments, Zanaty stated: "Robbie Dellinger of Universal Development Corporation holder of an unlimited commercial general contractor's license has been the contractor on the job at 212 through 218 20th Street No. … since day 1. He is recognized as such by the City of Birmingham." In another portion of his testimony, Scott Ward stated: " Robbie [Dellinger] was doing the work for Robbie. We [Universal] just pulled the permit." During Dellinger's testimony, at the same time that he stated that Universal was "ultimately responsible for the project," he also agreed with the proposition that he "would do all the work that was required of a general contractor in terms of supervising, making sure that the work was performed in a workmanlike manner, and according to the applicable Codes and specifications."

Dellinger argues that, even allowing for the fact that the evidence presented as to who acted as the general contractor for the Iron Age project is contradictory, the issue was rightly submitted to the jury as an issue of fact and that the jury obviously concluded that Universal, not Dellinger, was the general contractor. Thus, Dellinger contends that the licensure statutes cannot serve as a basis for voiding his agreement with Universal.

The problem for Dellinger is that, according to him, Universal agreed to support Dellinger to get paid for the work he was performing on the Iron Age project.

> "Q. [Dellinger's counsel:] And that you obviously -- They [Universal] would be paid for pulling the permits in the sum of $5,000.
>
> "A. Yes, sir.
>
> "Q. And you would be entitled to receive that which was owed from the owner or the owner's lender for the work on the project, right?
>
> "A. Yes, sir.
>
> "Q. And in the event that you weren't paid that they [Universal] would support you --
>
> "A. Yes, sir.
>
> "Q. -- in enforcing your right to be paid.

59

"A. Yes, sir.

"Q. That was the agreement.

"A. Yes, sir. …"

The lien Dellinger filed supports that idea, because the lien stated that it was filed "for work, labor and materials furnished to [Hatti and the Hatti Group and] for improvements made by [Dellinger and Universal] to [the Iron Age buildings]."

The reason Dellinger's "right to be paid" for work on the Iron Age project is problematic for him is that such a right arose from the PSA. As Dellinger himself admitted, he was not a party to the AIA contract. Moreover, his contract claim against Hatti was expressly based on the PSA, not the AIA contract. Thus, if Dellinger's agreement with Universal was that he would perform work on the Iron Age project "in a workmanlike manner" and that Universal would "support" Dellinger in any manner it could "in enforcing [Dellinger's] right to be paid," it was for payments Dellinger was owed under the PSA. However, under the PSA, Dellinger worked directly for Hatti. It is undisputed that Universal was not a party to the PSA. In his testimony about drafting the PSA, Zanaty stated that Dellinger had "said that he was working for Harsha

[Hatti] directly, and so we did a Personal Services Agreement." As the PSA stated at the outset: "Robbie Dellinger will work at the direction of Harsha Hatti[]. Robbie Dellinger has no liability for any decision made by Harsha Hatti[] on the building's redevelopment." The PSA further stated that Hatti would pay Dellinger directly for work performed. Moreover, even though the PSA stated that Dellinger would "provid[e] supervision only, [and] does not supply any labor or materials for Mr. Hatti[]," it is undisputed that Dellinger did, in fact, provide labor and materials for Hatti because Hatti "begged" Dellinger to do so because Hatti lacked local contacts. In short, under the PSA, Dellinger acted as a general contractor for Hatti on the Iron Age project.[14]

Dellinger attempts to avoid the foregoing conclusion first by arguing that the facts show that Hatti was in charge of the Iron Age

---

[14]Dellinger briefly argues that he "was not required to be licensed to enter the PSA as the AIA contract was the primary contract governing the rights and responsibilities of the parties." Dellinger's brief, p. 59. It is true that there was conflicting evidence as to whether the PSA was a supplement to the AIA contract or whether the PSA superseded the AIA contract, and so that issue was properly submitted to the jury. However, what Dellinger misses in making that point is that he was owed payments under the PSA, not under the AIA contract, and Universal was not a party to the PSA. Therefore, the licensure statute is relevant to Dellinger's contract claim against Universal because Universal's status as a general contractor is irrelevant to the PSA.

project in every facet: Hatti had to approve every payment from the bank; Hatti approved the hiring of subcontractors; Hatti was at the project site for several days every week; Hatti made detailed changes to the project's renovation plans; and Hatti even testified that he had "full decision-making authority on this project." Dellinger argues that those facts indicate that "compliance with the licensure statute is not necessary" because of the exception stated in § 34-8-7(a)(3), Ala. Code 1975. Dellinger's brief, p. 57. Section 34-8-7(a)(3), in pertinent part, provides:

> "(a) The following shall be exempted from this chapter [i.e., Title 34, Chapter 8]:
>
> "….
>
> "(3) … A person, firm, or corporation constructing a building or other improvements on his, her, or its own property provided that any of the work contracted out complies with the definition in this chapter for general contractor. …"

(Emphasis added.)

Hatti owned the Iron Age buildings, and there certainly is evidence supporting the notion that Hatti performed some duties ordinarily handled by a general contractor on a construction project, such as approving payments and approving subcontractors. But it is also clear

that, throughout the duration of the Iron Age project, Dellinger "superintend[ed] or engage[ed] in the construction, alteration, maintenance, repair, [and] rehabilitation" of the Iron Age buildings. § 34-8-1(a). Even in situations in which an owner performs construction work on his or her own buildings, § 34-8-7(a)(3) provides that "any of the work contracted out [must] compl[y] with the definition in this chapter for general contractor." Dellinger performed a lot of the construction work himself -- from providing the labor and materials, to paying subcontractors and vendors, to ensuring that the work was performed in a workmanlike manner. Yet, it is undisputed that Dellinger was not a licensed general contractor. Therefore, § 34-8-7(a)(3) does not exempt Dellinger's work from the licensure statutes.

In the alternative, Dellinger argues that the licensure statutes are "not implicated to the extent Dellinger sought and was reimbursed funds that he personally advanced on the [Iron Age] project. Herein, the licensure statute[s are] not implicated as the jury's verdict and damages awarded represented reimbursement for the funds Dellinger personally advanced, or loaned, to the project." Dellinger's brief, p. 60.

However, as we already have explained, Dellinger repeatedly testified that his agreement with Universal was that it would support him in getting paid for his work; the agreement was not that Universal would support Dellinger in seeking repayment on a loan. There is no evidence that Universal was aware that Dellinger was lending Hatti money to keep the Iron Age project going: Dellinger testified that he had told Scott Ward that he had not been paid for his work on the Iron Age project over a period of several months, and Ward testified that he had been aware that Dellinger was not being paid for his work, but he gave no indication that he had been aware that Dellinger was advancing large sums of money to enable Hatti to continue the renovation of the Iron Age buildings. Because Dellinger's claim against Universal was based on a failure to support Dellinger's efforts to seek payment for work performed on the Iron Age project, Dellinger cannot escape the application of the licensure statutes under the theory that Dellinger was owed repayment on a loan to Hatti.

Because Dellinger performed work as a general contractor for Hatti under the PSA, but Dellinger admittedly did not have a general contractor's license, the PSA contract is void as a violation of public

policy. Furthermore, Dellinger's claim against Universal was based on the premise that he was owed payments under the PSA and that Universal would support Dellinger in seeking to recover those payments. However, because the PSA is void as a matter of public policy, Dellinger did not have a valid legal claim against Universal because Universal could not have a legal obligation to support Dellinger in seeking payments on an unenforceable contract. Accordingly, the trial court should have granted Universal's motion for a judgment as a matter of law, and it should have dismissed Dellinger's breach-of-contract claim against Universal before it was submitted to the jury. Therefore, we reverse the trial court's judgment and render a judgment for Universal.

We recognize that the foregoing outcome could appear to be harsh given that Universal openly agreed to serve as "the figurehead general contractor" for the Iron Age project, as counsel for one of the parties expressed it in opening arguments to the jury. Thus, Universal accepted the benefits of an arrangement in which, as Scott Ward admitted, "[a]ll Universal used our name for was to pull the permit," so that the City of Birmingham and the bank that loaned Hatti the money for the project thought Universal was the general contractor, yet, in practice, "Dellinger

was his own contractor." However, as this Court previously has recognized, "the statute that we are dealing with is a penal one, and harsh results sometimes flow from the construction of a penal statute." Hawkins, 398 So. 2d at 237 (opinion on application for rehearing). Moreover, the fact remains that Dellinger was a willing party to the arrangement in which Universal served as a general contractor for the purpose of obtaining the required permits on the Iron Age project while Dellinger performed the rest of the work usually carried out by a general contractor.

## IV. Conclusion

The Hatti Group is dismissed as a party to appeal numbers SC-2023-0666 and SC-2023-0705 because none of the judgments at issue on appeal are based on adverse verdicts against the Hatti Group. Likewise, Hatti's appeal from the trial court's judgment entered in Hatti v. Universal, appeal number SC-2023-0666, is dismissed because no judgment in favor of Dellinger and adverse to Hatti was entered in that case, and so Hatti did not have a right to appeal from that judgment. Hatti's appeal from the trial court's judgment entered in Dellinger v. Hatti, appeal number SC-2023-0705, is also dismissed because Hatti did

not file a timely appeal from the final judgment rendered by the trial court on June 20, 2023. In appeal number SC-2023-0645, the trial court's judgment in favor of Dellinger is reversed and a judgment is rendered for Universal because Dellinger's claim against Universal was based on an underlying contract that is void based on public policy.

SC-2023-0645 -- REVERSED AND JUDGMENT RENDERED.

SC-2023-0666 -- APPEAL DISMISSED.

SC-2023-0705 -- APPEAL DISMISSED.

Shaw and Mitchell, JJ., concur.

Bryan, J., concurs specially, with opinion, which Parker, C.J., joins.

SC-2023-0645; SC-2023-0666; SC-2023-0705

BRYAN, Justice (concurring specially).

I concur in the Court's decision to dismiss appeal nos. SC-2023-0666 and SC-2023-0705. I also concur in the Court's decision in appeal no. SC-2023-0645 to reverse the judgment of the Jefferson Circuit Court and to render a judgment in favor of Universal Development Corporation. However, I write specially to explain my view that nothing in the Court's opinion should be read as affecting the enforceability of the judgment that Robbie Dellinger has obtained against Harsha Hatti.

Parker, C.J., concurs.